2025 IL App (1st) 250259-U

No. 1-25-0259

Order filed November 19, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| RYAN JONATHAN JONES, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 19 D 10636 |
| | ) | |
| LINDSAY THAI LE JONES, | ) | Honorable |
| | ) | Robert Johnson, |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Martin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court's decisions to award the parties unequal parenting time and to award the husband sole decision-making authority concerning their minor child's educational, medical, religious, and extra-curricular decisions were not an abuse of discretion or against the manifest weight of the evidence. However, the trial court erred in the classification of marital property, by failing to consider a marital asset, and by failing to adjudicate the wife's claim for dissipation of marital assets, so this cause is remanded for reconsideration of the property award and interrelated maintenance award.

¶ 2    In this dissolution of marriage proceeding, the trial court allocated parental responsibilities, issued a parenting plan, awarded maintenance, and distributed the parties' assets and debts.

¶ 3    On appeal,[1] respondent Lindsay Thai Le Jones argues that (1) the trial court's decisions regarding parenting time and decision-making were an abuse of discretion and contrary to the manifest weight of the evidence, (2) the trial court's disproportionate allocation of assets and debts inequitably favored petitioner Ryan Jonathan Jones and was an abuse of discretion, and (3) the trial court abused its discretion by awarding her maintenance based on income data of Ryan that was several years old.

¶ 4    For the reasons that follow, we affirm in part and reverse in part the judgment of the trial court.[2]

¶ 5                                I. BACKGROUND

¶ 6    The parties were married in June 2014, and have one son, K., who was born in July 2015. In February 2018, Lindsay moved out of the parties' home and into her mother's home. Shortly after the parties separated, they used a 50/50 parenting schedule, whereby Lindsay had K. every Monday and Tuesday night, and every other weekend from Friday evening until Monday morning,

---

[1]This appeal is subject to expedited procedures under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Paragraph (a)(5) of Rule 311 requires us to issue our decision within 150 days after the filing of the notice of appeal, except where good cause is shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, the notice of appeal was filed on February 10, 2025. This means we would have been required to issue our decision by July 10, 2025. However, due to difficulties in obtaining the bystander's report of the trial court proceedings and gathering the exhibits, the deadlines for respondent to file the record and for the parties to file their briefs with this court were extended. Specifically, supplements to the record were allowed on July 31, 2025, and respondent sought and received four extensions of time to file the appellant's brief, which was filed on August 28, 2025. Thereafter, petitioner filed his brief on September 18, 2025, and respondent sought and received one extension to file her reply brief, which was filed on October 8, 2025. Under these circumstances, we find good cause for issuing our decision after the 150-day deadline contemplated by Rule 311(a)(5).

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

and Ryan had K. every Wednesday and Thursday night and every other weekend from Friday evening until Monday morning. In December 2019, Ryan filed a petition for dissolution of marriage, and Lindsay filed a counterpetition in April 2020.

¶ 7   In January 2021, Ryan filed an emergency petition to restrict Lindsay's decision-making authority. Ryan alleged that Lindsay traveled to Boston with K. without disclosing his location to Ryan or the guardian *ad litem* (GAL) and refused to allow the GAL to interact with K. during the GAL's home visit. After an evidentiary hearing, the court found that Lindsay's testimony was not credible and her conduct constituted a serious endangerment to K.'s emotional and physical health. The court granted Ryan sole decision-making responsibility on a temporary basis and ordered Lindsay to exercise supervised parenting time and submit to a Supreme Court Rule 215(a) (eff. Jan. 1, 2018) evaluation. Six months later, the court lifted the supervision requirement.

¶ 8   In September 2022, Ryan filed an emergency motion, alleging that Lindsay picked K. up from school on Ryan's parenting time, refused to turn K. over to Ryan, and threatened to involve the police in response to Ryan's and the GAL's requests that Lindsay turn K. over to Ryan. In response, Lindsay filed an *ex parte* petition for an order of protection, which a separate judge denied. The court ordered Lindsay to pay Ryan $3800 for attorney fees he incurred incident to his emergency motion.

¶ 9   Meanwhile, in June 2021, Ryan had filed his notice of claim for dissipation, alleging that Lindsay dissipated about $28,000 of martial funds. In November 2024, Ryan amended that notice to include over $111,000 in expenditures by Lindsay. Lindsay also filed a dissipation notice, alleging that Ryan dissipated over $1 million of marital funds.

¶ 10    Trial proceedings in this matter were held on December 4 and 6, 2024. The parties waived the presence of a court reporter, and the record on appeal includes a bystander's report approved by the trial court.

¶ 11    The parties stipulated to the admission into evidence of the August 2023 report of the custody evaluator, Kara G. Anast, PsyD, Licensed Clinical Psychologist, who did not appear at the hearing to testify. According to her report, Dr. Anast conducted separate home observations with Ryan and K., and with Lindsay and K. Dr. Anast interviewed K. and the GAL, and administered tests. Dr. Anast also reviewed Lindsay's mental health evaluation; Ryan's resume; K.'s 504 plan and therapy progress notes; K.'s neuropsychological evaluation and occupational therapy evaluation; the parties' messages on the Our Family Wizard app; a timeline of events; court orders, motions and pleadings; and other documents. In her report, Dr. Anast noted that Ryan and Lindsay evenly split the caretaking functions for K. after he was born. Together, they chose K.'s doctor and school, and communicated regarding extracurricular activities. They made major decisions regarding K. together until January 2021.

¶ 12    Dr. Anast noted that the doctor who conducted Lindsay's Rule 215(a) mental examination concluded that Lindsay did not have any serious psychological disorders but recommended that she engage in therapy to reduce stress. Dr. Anast concluded that neither party struggled with significant mental health issues nor indicated concerns about the other's mental health.

¶ 13    Dr. Anast did not have significant concerns about either parent's ability to care for K., but she was concerned that both parties were significantly involved in the lack of effective communication regarding K.'s care. Dr. Anast was also concerned about the parties' inability to keep the conflict between them and their feelings about the other away from K. For example,

Lindsay did not want Ryan to come to the door of her home when he dropped off or picked up K., and she told Ryan not to come to her salon anymore. Although allegations were made about Lindsay putting her own anxiety onto K. or talking to him in a negative manner about Ryan and his family, no evidence supported those allegations. Similarly, claims Lindsay made were unsupported by additional evidence. Dr. Anast believed that both parents were able to meet K.'s emotional and physical needs. Although Dr. Anast had concerns, she opined, citing supporting research, that the parents would return to a higher level of functioning after the legal matters were resolved and the parents were in a routine. Furthermore, Dr. Anast conducted an analysis of the statutory best interest factors concerning decision-making and parenting time and discussed the relevant evidence pertaining to each of those factors.

¶ 14    For parenting time, regarding the option of having K. reside primarily with one parent and spending every other weekend and one evening each week with the other parent, Dr. Anast found that this option was not consistent with the significant involvement both parents had throughout K.'s life and concluded that such a plan was not in K.'s psychological best interest. Dr. Anast believed a 50/50 schedule would allow K. to develop and maintain a strong relationship with both parents, see both parents in many aspects of parenting, and receive good modeling in the future. A 50/50 schedule would provide consistency and decrease the potential for conflict by allowing each parent to sign K. up for extracurricular activities. Dr. Anast concluded that a 50/50 schedule was in K.'s psychological best interest and would be consistent with what had been occurring throughout the entirety of his life. In reaching her conclusion and recommendation, Dr. Anast considered statutory factors and noted that Ryan was amenable to alternative week parenting time.

¶ 15 For medical decision-making, Dr. Anast recommended a procedure for individual decision-making, working with a co-parenting therapist to facilitate an agreement, and Ryan ultimately making the decision if working with the co-parenting therapist failed. For extracurricular decision-making, Dr. Anast recommended that joint decisions be attempted. Otherwise, each parent would pick one activity. For religious decision-making, Dr. Anast recommended that both parents be able to have K. participate in the parents' respective traditions during his or her time. For educational decision-making, Dr. Anast recommended that K. attend school in Ryan's district.

¶ 16 Kathryn Ciesla testified that she was appointed to this matter as a GAL in December 2020. She has a background as a family law attorney and has been a GAL since 2012. She met with both parties and K. sometime when she was first appointed to this matter. Ciesla also had about five Zoom sessions with the parties. Ciesla explained that, based on the nature of this case, it was not necessary to meet with the parties or K. on multiple occasions. At the onset of the case, Ciesla was asked to visit K. at Lindsay's home due to allegations that Lindsay had taken K. out of state. However, Lindsay would not permit this visit and allowed Ciesla to only observe K. through a window due to Lindsay's concerns regarding the COVID-19 pandemic. Ciesla stated that she spoke to Ryan's mother and stepfather, and to Lindsay's mother and brother. Ciesla read the transcript of Lindsay's deposition, and attended the depositions of Ryan, Lindsay's mother, and Lindsay's brother. Furthermore, Ciesla read the report of Dr. Anast.

¶ 17 Ciesla testified that K., who was nine years old at the time of trial, is on the autism spectrum, has pathological demand avoidance, participates in various therapies, and needs special care and support. Ciesla recalled that when K. was diagnosed in 2020, Ryan was proactive whereas Lindsay delayed the therapy K. needed because she did not want to respond to Ryan. Ciesla

testified that Ryan is very attentive to K.'s needs and follows the professionals' recommendations. Ciesla did not have any concerns about Ryan, but believed that Lindsay did not act in K.'s best interest due to her significant conflicts with Ryan during the past four years. According to Ciesla, Lindsay's reactions are not in K.'s best interests because he is able to understand and pick up on the tension between his parents. Lindsay lives with her family, who are close to K. and appreciate him, but Ciesla believed that K. has a closer relationship with Ryan. Ciesla believed that Ryan and Lindsay are each able to provide a safe, stable, and healthy environment for K, but Lindsay delays K.'s care due to animosity she has with Ryan.

¶ 18 Ciesla testified that, prior to the start of trial, Lindsay told her that Lindsay's relationship with Robert, her partner of a few years, had ended due to the strain of this litigation. Ciesla, however, did not believe Lindsay, and concerns had been raised about Robert's involvement with K. and Lindsay's prioritization of Robert over K.'s needs. Ciesla believed that the parties were unable to co-parent because there was too much animosity between them. Ciesla had changed her previous recommendation for equal parenting time. Although K. was accustomed to the parties' current 50/50 week on-week off parenting schedule, which had been in place for the past three years, Ciesla now recommended that Lindsay's parenting time be every other weekend, from Friday through Monday, with pickups and drop-offs to be at the school, and for Lindsay to have one to two overnights during the weekdays per week.

¶ 19 Ciesla believed that Lindsay, close to the start of this trial, made an anonymous report to the Department of Children and Family Services (DCFS), alleging that Ryan was abusive and a danger. The allegations, *i.e.*, that K. told school staff that Ryan had caused bruise marks on K., resulted in an active DCFS investigation of Ryan. The DCFS investigator told Ciesla that the

investigator was leaning towards finding the allegations unsubstantiated. Ciesla believed Lindsay was the source of this report because many of the allegations raised to DCFS were concerns that Lindsay had expressed to Ciesla during the course of the litigation. Moreover, when Ciesla asked Lindsay whether she had made the anonymous report, Lindsay did not express any concern about the existence of the allegations and DCFS report, but instead merely denied making the report.

¶ 20    Ciesla believed that Lindsay made derogatory comments to K. regarding Ryan's gender identity and that Lindsay cannot make decisions in the best interest of K. due to her biases regarding Ryan's gender identity. Ciesla, however, could not testify to any evidence about why she thought Lindsay made derogatory statements about Ryan's gender identity to K. Ciesla recommended that Ryan involve Lindsay in the decision-making for K.'s medical and health-related issues, but Lindsay's agreement should not be required and Ryan should have final decision-making responsibility for K. Moreover, Lindsay could choose to obtain a second opinion for medical issues and must respond to Ryan's message regarding the decision within 48 hours. Ciesla recommended that Ryan be solely responsible for holding K.'s passport and releasing it for agreed-upon travel. Also, since Ciesla believed that Lindsay, Robert, and K. all shared the same bed, Ciesla recommended that the parties must ensure that K. does not share a room with any unrelated adults, except for vacations.

¶ 21    Lindsay's mother, Tan Le, testified that Lindsay and K. are very close, and Lindsay is a great mother and very active in K.'s life. Lindsay and K. live in the basement of Tan Le's home, and they each have their own beds. Although Tan Le testified in her deposition that Lindsay and K. shared a bedroom, she testified at trial that K. currently has the master bedroom in the basement. Moreover, Lindsay may move out to a new residence. When Lindsay's former partner Robert

visited every three to four months, he stayed in a hotel or slept in the basement living room. Tan did not keep records of the $900 monthly rent Lindsay paid her.

¶ 22    Tan is a nail technician and the sole owner of the salon where Lindsay works as an independent contractor. Lindsay is both the salon manager and a hairstylist. She works five days per week. According to her contract, Lindsay keeps 50% of the commission she earns, and the other 50% goes to the salon. However, according to her deposition, Tan testified that Lindsay received 50% of the total income generated by the salon. According to Tan, tips are built into the costs of the salon's services, and Lindsay never receives tips. Lindsay is authorized to use the salon's credit card to purchase products for the salon and Tan's personal use, but Tan is the only one who pays for this card. Tan was not aware that Lindsay charged $44,000 to the card. Lindsay travels to Boston about once every month for about one to three days and purchases various products for the salon. Tan testified that the United States Small Business Administration (SBA) loan Lindsay took out for Psychomomo, a company Ryan had created, was never used for any of the salon's expenses. Although Tan testified at her deposition that she had felt the need to sleep in Lindsay's room because Tan was concerned about Lindsay's mental health around K., Tan testified at trial that she has never had concerns about Lindsay's mental health and Lindsay never put K. in danger. Lindsay travels often, and Tan loaned her about $70,000. Tan believes Lindsay is able to support herself and K.

¶ 23    Ryan testified that he and Lindsay were involved in K.'s education, helped him with this homework, attended his individual education planning meetings and parent-teacher conferences, and took him to his extracurricular activities. Ryan was awarded temporary sole decision-making authority for K. in January 2021, after Lindsay took K. to Boston without notice. Ryan tries to

include Lindsay in decision-making, but these attempts are often unsuccessful. According to Ryan, when he tries to involve Lindsay in a decision, she will delay, object, or not respond to him. Ryan consulted with Lindsay prior to enrolling K. in various therapies for his autism, but Lindsay thought the therapies were too frequent and unnecessary. Ryan thought that K.'s autism symptoms were well managed when K. was under Ryan's care. He speaks calmly to K., and they talk through issues. Although K. does not like change, he does not struggle with it to the extent that Lindsay believes. K. is sometimes a little delayed when he is placed in a new environment and has a hard time transitioning after each parental exchange. K. gets along with everybody but he has hit Ryan and other kids at school due to behavioral issues that are typical for someone with K.'s diagnosis. K.'s allergies are managed with over-the-counter medication, and he also has eczema and asthma. K. has his own bed and bedroom at Ryan's residence. In 2022, the GAL filed an emergency motion with the court because Lindsay refused to return K. During that time, Ryan was unable to speak to K. because Lindsay interfered with the telephone calls.

¶ 24    Ryan testified that he would like sole decision-making ability for all child-related issues because K. is thriving under Ryan's care due to Ryan's decisions. Ryan did not believe that he and Lindsay could co-parent regarding K.'s health issues because Lindsay usually made Ryan do all the work or delayed K.'s treatment by not responding to Ryan's messages.

¶ 25    Ryan thought that the parties' current 50/50 week on-week off parenting schedule, which he created in 2020, was no longer in K.'s best interest. Ryan believed that Lindsay did not trust him. Ryan said that K. loves Lindsay but is also afraid of her and will do certain things to win her approval. According to Ryan, K. told him that K. is not comfortable speaking to Ryan when Lindsay is present.

¶ 26    Ryan testified that he received a Bachelor of Arts degree in graphic design in 2005. He works from home, is employed by Cinchio Solutions since April 2024, and his current annual salary is $220,000. He does not receive any benefits from his employer and is not entitled to any stock options or stake in the company. When Lindsay moved out of the parties' home in February 2018, Ryan was employed by Slalom and his annual income was $90,000. Ryan started at Slalom in 2017, and his gross annual income there eventually became about $185,000. According to Ryan, Lindsay did not contribute money to the marital residence aside from about $5000 in closing costs.

¶ 27    Ryan testified that he created Psychomomo in 2011 for IT consulting. Ryan and Lindsay would also accept transactions and salon services under Psychomomo. Before the pandemic and during their marriage, Lindsay received cash tips, which she would keep in their home. She would deposit her salon commissions and any tips she received that were not in cash into the Psychomomo account and use those funds to pay the rent for the space she used for her salon services. Ryan believed that Linday's income during their marriage was about $95,000 when she was working regularly. Ryan agreed with Lindsay about obtaining the SBA loan through Psychomomo and answered her questions regarding applying for the loan. Ryan closed Psychomomo in 2020. According to Ryan, Lindsay receives cash tips at her mother's salon, spends a lot of time traveling, and was not self-supporting. Since 2019, Ryan has been the sole provider for all of K.'s expenses aside from basic living expenses when K. is with Lindsay. Ryan has spent about $39,000 on child-related expenses and needs, and Lindsay never contributed to these items. Ryan pays $600 monthly for the health insurance premiums. Ryan has a 529 account containing $22,000. Ryan testified that he dines out two to three times per week. In 2019, he started dating Lilian Allen, and she has a great relationship with K. and sees him multiple times a week when K.

is with Ryan. Ryan usually does not pay for Lilian or any of her expenses. They exchange gifts only on special holidays.

¶ 28    Lindsay testified that she has an associate's degree in applied science and has been a hairstylist since 2004. When she still lived with Ryan, she deposited her income in their joint bank account. After their separation, she deposits her income into her separate bank account. She has worked at her mother's salon since 2011 as an independent contractor and is also a manager there. Lindsay does not receive any compensation for her managerial role. She works Tuesday through Saturday, from about 9 a.m. to 7 p.m. However, she did not work during the pandemic while K. was having remote learning. When Lindsay was still with Ryan, she occasionally received tips at the salon from her clients; however, since the pandemic, she has never received any tips. Her annual gross income for 2024 was about $38,000 to $40,000. Although Lindsay had stated on credit card applications that her income was $75,000 and $70,000, she asserted that everyone exaggerates their income on credit applications.

¶ 29    Lindsay testified that she contributed $10,000 towards the downpayment of the marital residence and about $5000 towards the closing costs. However, she did not submit any proof of these contributions. Furthermore, she alleged that Ryan dissipated about $1.2 million of marital assets. In 2019, the parties claimed about $90,000 in business receipts on Psychomomo's tax documents. During the pandemic, she obtained, with Ryan's instruction and help, the $40,000 SBA loan in Psychomomo's name. She claimed that she needed the loan for business expenses and the payroll of Psychomomo's employees, but acknowledged that she received unemployment income in 2020. She withdrew the loan funds and used them from 2020 to date, holding them in cash. She

has not been able to repay the loan. She has consolidated her debts but is not currently making any payments on any of her debts.

¶ 30    She uses her credit cards to pay for expenses and has incurred a lot of credit card debt because Ryan has not been supporting her financially. During the marriage, they traveled almost every month, mostly to visit Ryan's family in Indiana.  Lindsay travels once a month, usually to Boston, and her mother travels with her. She also travels to see her sister and brother, each three times per year. In September 2024, she traveled to Europe for about 10 days. Her mother has loaned her about $70,000 in cash. Lindsay used this loan to pay her legal fees and her and K.'s living expenses. She has used her mother's business credit card to pay for a watch, services and training from a salon in New York, a cruise, restaurants, chiropractic services, gas station purchases, concert tickets, and stays at hotels and a lodge.

¶ 31    Lindsay testified that the marriage broke down about May 2015, while she was about seven months pregnant with K., largely due to Ryan suddenly wanting to change his gender. Although Lindsay resented Ryan for that, she has now forgiven him. Lindsay believes both parties can co-parent, but admits that she has criticized Ryan's parenting choices and decision-making via the Our Family Wizard co-parenting app. Lindsay also admitted that she told Dr. Anast during Lindsay's evaluation that Ryan will attempt to make small talk with her but she cannot fake a relationship with him. Lindsay wants to work with Ryan and thought the parties would be able to make decisions jointly and co-parent successfully. Lindsay believes that if the parties cannot reach an agreement, they should go to a mediator or co-parenting therapist to try to assist them in reaching an agreement. Lindsay believed that she would listen to the recommendations of a co-

parenting therapist, but acknowledged that she did not listen to the GAL's instruction to return K. when Lindsay was concerned about the COVID-19 pandemic.

¶ 32    Lindsay started dating Robert in 2019, but he ended their relationship after Thanksgiving in 2024 because he did not want to be involved in this litigation any further. Lindsay did not know if their relationship would continue. When Robert had visited her, he stayed either in a hotel, the guest room, or the living room. When Tan's basement was renovated, Robert and Lindsay began to sleep in the same room, but only when Lindsay did not have K. She and K. have separate beds, and she recently moved out of the same room to allow K. to have the room to himself. K. does not share a bed with Robert, and Robert is not a danger to K. According to Lindsay, during the entirety of the case, the GAL spoke to her less than four times, and usually Lindsay's messages and e-mails to the GAL went unanswered. Lindsay said that the GAL never saw K. and never spoke to Robert.

¶ 33    Lindsay testified that in 2021 the court required her parenting time with K. to be supervised by her mother and brother after Lindsay refused to return K. She had alleged that she was acting on concerns about the COVID-19 pandemic and K. visiting his paternal grandfather, who had allegations against him involving inappropriate conduct with a minor, but the court had found that Lindsay was not credible. Lindsay has obsessive compulsive disorder, struggled with postpartum depression and completed treatment for it, and receives therapy to manage her mental health symptoms. Lindsay underwent therapy to be a better person and parent for K., and the parties slowly transitioned back to their regular, 50/50 week on-week off parenting schedule. Lindsay did not want to change this schedule because K. needs routine and stability and will not cope well with a change. According to Lindsay, this schedule had been in place since K. was in prekindergarten in 2019.

¶ 34    Lindsay testified that she has a very close relationship with K., who is very emotionally intelligent. Lindsay is okay with K. staying in his current school but would like to practice selective enrollment each year to ensure he is getting the support he needs. K. is very close to Lindsay's family, but she does not know if K. has a relationship with Ryan's parents. Lindsay stated that sometimes K.'s autism symptoms can be difficult to manage. Lindsay is concerned that K. struggles with any kind of change to his routine, sometimes slams doors at home, and has had issues with violent behavior in school and towards Ryan. Therapy has taught K. healthy coping mechanisms, and the parties learned how to co-parent better with the help of K.'s therapist. Lindsay is also concerned about Ryan having a dog in his home due to K.'s pet dander allergies and Ryan's refusal to acknowledge this risk to K. Further, Lindsay was concerned about Ryan's partner, Lilian, living with him and not treating K. well. Lindsay wanted the parties to alternate holding K.'s passport. She was okay with Ryan taking K. on international trips provided she received one month's notice.

¶ 35    Lindsay wants the parties to have joint decision-making authority for K.'s health, extracurriculars, and remaining issues. She is willing to contribute 20% to 30% towards the child-related expenses. However, Lindsay wants to be responsible for 15% of the expenses and Ryan responsible for 85% due to the disparity in their incomes. Lindsay also requests maintenance and child support from Ryan.

¶ 36    Lindsay's brother, Cong Thai Le, testified that he lives with their mother, her husband, a cousin, and Lindsay. Cong is very close to K., they are buddies, and Cong helps care for K. when Lindsay is unavailable. All four of Lindsay's siblings are close to K. Lindsay is a good mother, and K. does not share a bed with Robert.

¶ 37    Lindsay's brother-in-law, Robert Huynh, testified that he, Lindsay's sister, and their children live in Atlanta and are very close to Lindsay and K. Huynh believes that Lindsay is an excellent mother and goes out of her way to cater to K.'s needs and be there for him. She prioritizes K. and loves him, and they have a very close relationship.

¶ 38    In December 2024, the court ordered the parties to submit written closing arguments and proposed judgments. The record, however, does not contain Ryan's written closing argument, proposed judgments, and child support and maintenance calculations.

¶ 39    On January 13, 2025, the trial court, "being fully advised in the premises," entered a judgment allocating parental responsibilities and parenting time. Relevant to this appeal, the court awarded Ryan final decision-making authority for K.'s educational, medical, religious, and extracurricular decisions. The court awarded Lindsay parenting time on alternating weekends, Friday to Sunday, and one weeknight on Wednesday. Ryan has parenting time at all other times not specifically designated to Lindsay.

¶ 40    On February 6, 2025, the trial court, "having heard the evidence and the testimony of the witnesses" and "being fully advised in the premises," entered a judgment of dissolution of marriage. Regarding maintenance, the court found that Ryan's current annual income was $220,000 and Lindsay's testimony regarding her income was not credible. The court found that Lindsay was not working full-time and that imputing an income of $50,000 annually to her was reflective of full-time employment in her field. Using Ryan's current income and Lindsay's imputed income, the maintenance calculation for Lindsay would be $3,257.58 monthly for 15 months. However, the trial court noted that the parties had been living separately for seven years, they had an equal parenting time schedule during their separation, and, when they separated in

February 2018, Ryan earned $90,000 annually and Lindsay earned $32,000 annually. The court concluded that Lindsay did not contribute to Ryan's increase in income and it was equitable to calculate maintenance based on the income that reflected the lifestyle of the parties when they separated in February 2018. Accordingly, the court awarded Lindsay maintenance of $604.58 monthly for 15 months.

¶ 41 Regarding child support, based on Ryan's annual income of $220,000 and Lindsay's imputed annual income of $50,000 (if she worked full-time and traveled less), the court ordered Lindsay to pay Ryan $384 monthly. Child expenses were divided between Ryan and Lindsay at 80% and 20%, respectively. Regarding Ryan's petition for contribution for K.'s expenses, the court ordered Lindsay to pay Ryan $6001, *i.e.*, 20% of the $30,005 Ryan had incurred in child expenses.

¶ 42 Regarding the parties' marital and nonmarital assets, the court stated that "[i]n advance of trial, the parties stipulated that they accept such division [of assets] as outlined herein as the final, complete, and equitable distribution of the marital and nonmarital property." The court awarded Ryan the nonmarital real estate. The court awarded Lindsay 50% of the marital portion of five listed accounts held by Ryan (*i.e.*, four Fidelity accounts and one Principal Rollover IRA). The court defined the marital portion as the period of June 23, 2014 (*i.e.*, the date of the parties' marriage), to December 23, 2019 (*i.e.*, the date Ryan filed his divorce petition). The court also awarded, "[a]bsent anything provided for here-in above," Lindsay 20% and Ryan 80% of 16 listed accounts held in Ryan's individual name. However, 3 of those 16 listed accounts were previously included in the list of 5 accounts already awarded to Lindsay at 50% (*i.e.*, the Fidelity SEP IRA account No. x0434, the Fidelity Rollover IRA account No. x2690, and the Fidelity Individual Investment account No. x1600).

¶ 43     The court also ruled that Lindsay was 100% responsible for the debt associated with the SBA loan acquired in 2020. The court denied Ryan's dissipation claim.

¶ 44     Lindsay timely appealed.

¶ 45                                    II. ANALYSIS

¶ 46                          A. Decision-Making and Parenting Time

¶ 47     First, Lindsay argues that the trial court abused its discretion by giving Ryan decision-making authority and awarding Lindsay only Wednesday weeknights and alternating weekends for parenting time. Specifically, Lindsay argues that this court has no basis to presume the trial court properly considered the statutory factors pertaining to decision-making and parenting time because the trial court did not make sufficient factual findings, did not summarize the evidence presented, and did not articulate a review of statutory factors in arriving at its decisions. Furthermore, although Dr. Anast conducted an analysis of the statutory factors in her report, Lindsay argues that the trial court did not state that it relied on Dr. Anast's report and, thus, there is no basis to support the presumption that the trial court considered the statutory factors.

¶ 48     Determining parenting time and allocating decision-making authority are matters within the sound discretion of the circuit court. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. Sections 602.5 and 602.7 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.5, 602.7 (West 2018)) govern those determinations and provide that circuit courts must allocate these parental responsibilities according to the child's best interest. " 'In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child.' " *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64 (quoting *In re Marriage of Agers*,

2013 IL App (5th) 120375, ¶ 25). "We will not overturn the court's decision unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence." *Sadler v. Pulliam*, 2022 IL App (5th) 220213, ¶ 42. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47.

¶ 49    In making its determination of parental decision-making responsibilities, the circuit court considers the relevant factors set forth in section 602.5(c) of the  Act (750 ILCS 5/602.5(c) (West 2018)), which include (1) the child's wishes, (2) the child's adjustment to his or her home, school, and community, (3) the mental and physical health of all individuals involved, (4) the ability of the parents to cooperate to make decisions, or the level of conflict that may affect their ability to share decision-making, (5) the level of each parent's participation in past significant decision-making with respect to the child, (6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child, (7) the parents' wishes, (8) the child's needs, (9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement, (10) whether a restriction on decision-making is appropriate, (11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, (12) the physical violence or threat of physical violence by the child's parent directed against the child, (13) the occurrence of abuse against the child or other member of the child's household, (14) whether one of the parents is a sex offender, and (15) any other factor that the court expressly finds to be relevant.

¶ 50    In making its determination regarding the allocation of parenting time, the circuit court considers the relevant factors set forth in section 602.7(b) of the Act (*id*. § 602.7(b)), which include (1) each parent's wishes, (2) the child's wishes, (3) the amount of time that each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities, (4) any prior agreement or course of conduct between the parents relating to caretaking functions, (5) the interaction and interrelationship of the child with his parents and siblings and with any other person who may significantly affect his best interests, (6) the child's adjustment to his home, school, and community, (7) the mental and physical health of all individuals involved, (8) the child's needs, (9) the distance between the parents' residences, (10) whether a restriction on parenting time is appropriate, (11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household, (12) each parent's willingness and ability to place the child's needs ahead of his or her own, (13) each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child, (14) the occurrence of abuse against the child or other member of the child's household, (15) whether one parent is a sex offender or resides with a sex offender, (16) the terms of the parent's military family-care plan if a parent is a member of the United States Armed Forces who is being deployed, and (17) any other factor that the court expressly finds to be relevant.

¶ 51    The circuit court is not required to make explicit findings or reference each factor in determining the child's best interest (*Jameson*, 2020 IL App (3d) 200048, ¶ 47), and this court presumes that the circuit court knew and followed the law (*In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43). A party's mere assertion that the circuit court did not consider the statutory

factors is insufficient to overcome the presumption that the trial court knew and followed the law. *Id*. ¶ 44.

¶ 52    Here, when allocating parental responsibilities (both parenting time and decision-making), the trial court did not mention the statutory factors and did not provide a summary of the evidence as it related to the relevant factors in sections 602.5(c) and 602.7(b) of the Act. However, in her report, Dr. Anast discussed the relevant evidence pertaining to each of the best interest factors set forth in sections 602.5(c) and 602.7(b). Furthermore, the trial court's allocation judgment stated that the court was "fully advised in the premises." Accordingly, we presume the trial court properly considered all statutory factors. See *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 18 (where the circuit court did not mention any statutory factor or summarize the evidence, the reviewing court presumed that the circuit court properly considered all statutory factors because the circuit court expressly stated that it considered all the evidence in rendering its decision and the GAL's report analyzed the factors in depth).

¶ 53    Next, Lindsay argues that the trial court's parenting time decision was against the manifest weight of the evidence. Lindsay argues that the GAL's testimony rested upon opinions rather than facts or evidence, and the GAL did not articulate why she changed her earlier recommendation for equal parenting time to a schedule that favored Ryan. Lindsay also argues that the GAL referenced certain facts that were not pertinent to the issue of parenting time. Lindsay asserts that the GAL's investigation lacked depth whereas Dr. Anast undertook a far deeper, comprehensive, research-based analysis of the facts. Lindsay contends that the manifest weight of the evidence supports Dr. Anast's recommendation of 50/50 parenting time, and even Ryan admitted that the parties had been exercising shared time for years, which was his plan in the first place.

¶ 54     The trial court is required to consider the credibility of the testimony, weigh the evidence, and exercise its discretion to determine the best interest of the child. See *In re Custody of Sussenbach*, 108 Ill. 2d 489, 499 (1985). The court should not consider conduct of either parent that does not affect that parent's relationship to the child, and harm should not be presumed even if the conduct was allegedly immoral (*In re Marriage of Craig*, 326 Ill. App. 3d 1127, 1129 (2002)), because the welfare of the child is of paramount importance, not the punishment of the mother or father (*Fears v. Fears*, 5 Ill. App. 3d 610, 614 (1972)).

¶ 55     We conclude that the trial court's order awarding Lindsay parenting time on alternating weekends and on Wednesday night each week and awarding the remainder of parenting time to Ryan was not against the manifest weight of the evidence. There was evidence that K. has special needs and requires consistency, K. had adjusted to both homes and communities where Ryan and Lindsay lived, and both parents had shared the caretaking activities. However, there was evidence regarding Lindsay's unwillingness to encourage a close relationship between K. and Ryan. For example, Lindsay took K. during Ryan's parenting time and had refused to return K., and the court found that her explanation for her conduct, *i.e.*, that she was acting based on concerns about the COVID-19 pandemic and protecting K. from the alleged inappropriate conduct of his paternal grandfather, was not credible. Also, Lindsay admitted that she told Dr. Anast during Lindsay's evaluation that Ryan would attempt to make small talk with her, but she could not fake a relationship with him. Further, Lindsay complained about Ryan's presence at the salon or her home when he would drop off or pick up K. Given the deferential standard of review applied when reviewing the allocation of parenting time, we cannot conclude that the trial court's decision in this case was unreasonable, arbitrary, or not based upon the evidence.

¶ 56    Regarding decision-making, the evidence shows there was a high level of conflict between the parties and Lindsay criticized Ryan's parenting on the Our Family Wizard app. The evidence also showed that K. was receiving appropriate treatments and help academically after Ryan was given temporary sole-decision-making authority for K. after January 2021. Moreover, the record contains support for Lindsay's unwillingness to work with Ryan and failure to make timely decisions regarding K.'s medical care, therapy, and other matters. We cannot conclude that the trial court's decision to include Lindsay in the decision-making process but to give Ryan sole decision-making authority was against the manifest weight of the evidence.

¶ 57                        B. Distribution of Assets and Debts

¶ 58    Lindsay argues that the trial court abused its discretion in distributing the parties' assets and debts.

¶ 59    Marital debts and assets must be distributed equitably. *In re Marriage of Underwood*, 314 Ill. App. 3d 325, 328 (2000). However, an equitable distribution of assets and debts does not require mathematical equality. *In re Marriage of Awan*, 388 Ill. App. 3d 204, 213 (2009). Section 503(d) of the Act provides that in a dissolution proceeding, the court is to divide the parties' marital property in just proportions considering all relevant factors. 750 ILCS 5/503(d) (West 2018). Those relevant factors include the following:

> "(1) each party's contribution to the marital estate; (2) the dissipation of martial assets by either party; (3) the value of the property assigned to the spouse; (4) the duration of the marriage; (5) the relevant economic circumstances of each spouse when the division of the property is to become effective; (6) any obligations and rights arising from a prior marriage of either party; (7) any antenuptial agreement of the parties; (8) the age, health, station,

occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties; (9) the custodial provisions for any children; (10) whether the apportionment is in lieu of maintenance; (11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and (12) the tax consequences of the property division upon the respective economic circumstances of the parties." *Id*. § 503(d).

¶ 60    The "trial court has broad discretion in the valuation and subsequent distribution of marital assets." *Kew v. Kew*, 198 Ill. App. 3d 61, 65 (1990).

"An abuse of discretion is said to have occurred only when no reasonable person would take the view adopted by the trial court. [Citation.] To find an abuse of discretion this court must be able to say the trial court acted arbitrarily or without conscious judgment, or that [the court's] order either exceeds the bounds of reason or ignores recognized principles of law so that substantial injustice occurs." *In re Marriage of Courtright*, 229 Ill. App. 3d 1089, 1093 (1992).

¶ 61    First, Lindsay argues that the dissolution of marriage judgment is contradictory because the court, in two consecutive sections of the judgment, awarded Lindsay 50% and Ryan 80% of the same three accounts: the Fidelity SEP IRA account No. x0434, the Fidelity Rollover IRA account No. x2690, and the Fidelity Individual Investment account No. x1600.

¶ 62    This argument lacks merit because the judgment is not contradictory and the court clearly awarded Lindsay 50% of these three accounts. Specifically, the court, in section "S" of the judgment, included these three accounts in the list of five accounts held by Ryan that were awarded to Lindsay at 50% of the marital portion. Then, in section "T" of the judgment, the court stated,

"Absent anything provided for here-in above," and awarded Lindsay 20% and Ryan 80% of 16 listed accounts held in Ryan's name. This list of 16 accounts included the 3 aforementioned Fidelity accounts already awarded to Lindsay in section "S" at 50%. Despite the court's inclusion of the 3 aforementioned Fidelity accounts in the subsequent list of 16 accounts in section "T," the court's qualifying statement "[a]bsent anything provided for here-in above," establishes that those 3 Fidelity accounts, which were already awarded to Lindsay in section "S" at 50% of the marital portion, are not subject to the 20% and 80% split set forth in section "T."

¶ 63    Second, Lindsay challenges the trial court's decision in section "S" of the judgment to define the marital portion of the five accounts awarded to her at 50% as accruing from the date of their marriage on June 23, 2014, to the date Ryan filed his petition for divorce on December 23, 2019. Lindsay argues that there is no testimony or evidence to support the court's finding that benefits accumulated during the marriage from December 23, 2019, through the date of judgment on February 6, 2025, are non-marital. We agree.

¶ 64    Before the trial court may distribute property upon the dissolution of a marriage, the court must first classify the property as either marital or nonmarital. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 166 (2000). Section 503(a) of the Act establishes a rebuttable presumption that "all property acquired by either spouse subsequent to the marriage" is marital property. 750 ILCS 5/503(a) (West 2018). A party can overcome this presumption only by a showing of clear and convincing evidence that the property falls within one of the eight exceptions listed in section 503(a). *In re Marriage of Schmitt*, 391 Ill. App. 3d 1010, 1017 (2009). Those exceptions are as follows:

"(1) property acquired by gift, legacy or descent; (2) property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, legacy or descent; (3) property acquired by a spouse after a judgment of legal separation; (4) property excluded by valid agreement of the parties; (5) any judgment or property obtained by judgment awarded to a spouse from the other spouse; (6) property acquired before the marriage; (7) the increase in value of property acquired by a method listed in paragraphs (1) through (6) of this subsection, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section; and (8) income from property acquired by a method listed in paragraphs (1) through (7) of this subsection if the income is not attributable to the personal effort of a spouse." 750 ILCS 5/503(a) (West 2018).

"[A]ny doubts as to the nature of the property are resolved in favor of finding that the property is marital." *Schmitt*, 391 Ill. App. 3d at 1017.

¶ 65    Although the dissolution judgment states that "[i]n advance of trial, the parties stipulated that they accept such division as outlined herein as the final, complete, and equitable distribution of the marital and non-marital property," the record does not support this statement. Specifically, the written closing argument and proposed dissolution judgment Lindsay submitted to the court requests a distribution of the parties' assets and debts that is not consistent with the distribution awarded by the court in the dissolution judgment. Furthermore, Ryan does not argue on appeal that the parties stipulated to accept the distribution as outlined in the dissolution judgment. We conclude that the trial court abused its discretion when the court decided, as to the five accounts

listed in section "S" of the judgment, that benefits accumulated during the marriage from December 23, 2019 (the date Ryan filed his divorce petition), through the date of judgment on February 6, 2025, are non-marital.

¶ 66    Third, Lindsay argues that the court failed to award assets or awarded assets in such an unclear way that it cannot be determined if an asset was divided. For example, the court did not award Ryan's T. Rowe IRA account valued at $21,164.60 to either party. We agree that the trial court abused its discretion when it failed to award this T. Rowe IRA account to either party. Lindsay also complains that the Fidelity Roth IRA account No. x0630 is described in Ryan's October 2024 financial affidavit as having a value of both $65,640.99 and $4,133.16. This discrepancy does not constitute an abuse of discretion by the court, which awarded Ryan 80% and Lindsay 20% of the value of Fidelity Roth IRA account No. x0630, whatever that value may have been at the time of trial.

¶ 67    Fourth, Lindsay argues that not all accounts were valued as required by statute, and the accounts were not valued at the time of trial. We find no abuse of discretion by the trial court here. The account values in the record are based on Ryan's financial affidavit dated October 11, 2024, about two months prior to trial. There is no indication in the record that Lindsay submitted a more recent valuation of accounts into evidence. "[P]arties should not be allowed to benefit on review from failure to introduce evidence at trial [citation]; therefore, a reviewing court will not reverse a trial court where parties have failed to produce evidence of value when there was ample opportunity to do so. [Citation]." *In re Marriage of Albrecht*, 266 Ill. App. 3d 399, 403 (1994).

¶ 68    Fifth, Lindsay argues that although both parties filed dissipation of assets claims, the court adjudicated only Ryan's claim. We conclude that the trial court abused its discretion by failing to adjudicate Lindsay's dissipation of assets claim.

¶ 69    Finally, Lindsay argues that the assets and debts were not allocated equitably. She argues that Ryan possesses significant nonmarital assets ($307,986.23 in real estate), a superior earning capacity, and a greater opportunity to acquire capital assets and income than her. She argues that she was awarded $552,940.21 in marital assets and Ryan was awarded $2,130,082.54. Furthermore, each party was allocated their respective debts, but she was allocated 100% of the SBA loan debt, so Ryan was assigned $77,358.35 in debt whereas she was assigned $163,176.3 in debt.

¶ 70    We decline to decide Lindsay's issue regarding the equitable division of assets and debts, and her challenge to the amount of her maintenance award, as both are related to the issue of property classification. See *Schmitt*, 391 Ill. App. 3d at 1022 (trial court's error in property classification and consequent error in distribution of marital property requires remand for redetermination of distribution, contribution, and maintenance issues); *In re Marriage of Feldman*, 199 Ill. App. 3d 1002, 1006 (1990), abrogated on other grounds by *In re Marriage of Brankin*, 2012 IL App (2d) 110203 (where the trial court erred by excluding several items of marital property from its consideration, the maintenance award should likewise be reversed for redetermination based on all marital property); *Olsher v. Olsher*, 78 Ill. App. 3d 627, 637 (1979) (Illinois courts and other courts had "found it desirable to remand to the trial court all interrelated property and support issues" after it was determined "that a marital asset was not considered at the time of the original disposition" or a marital asset was not properly valued). "[P]roperty cannot be

properly divided until it is properly classified." *In re Marriage of Dann*, 2012 IL App (2d) 100343, ¶ 155. Moreover, in evaluating a spouse's request for maintenance, courts consider the size of the spouse's nonmarital estate, and the amount of marital property awarded to her. See 750 ILCS 5/504(a)(1) (West 2018) (factors relevant to maintenance determination include "the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance").

¶ 71    Because the trial court mistakenly characterized marital property as non-marital, failed to consider the T. Rowe IRA account, and failed to adjudicate Lindsay's claim for dissipation of marital assets, the intended distribution scheme may be compromised and a remand for a redetermination and redistribution of marital property is required.

¶ 72    As to issues that may arise again in the trial court should the court's reconsideration of the property require a reworking of the entire property distribution, we consider below Lindsay's challenges to the trial court's treatment of the maintenance award.

¶ 73                              C. Maintenance Award

¶ 74    Lindsay argues that the trial court abused its discretion by calculating her maintenance award based on Ryan's $90,000 annual income in 2018 (the year that they started living separately), instead of Ryan's $220,000 annual income at the time of trial in December 2024. According to the dissolution judgment, the trial court used Ryan's 2018 income to calculate Lindsay's maintenance award because the court found that Lindsay did not contribute to Ryan's increase in income and "maintenance calculated at incomes that reflect the lifestyle of the parties at the time of their separation in 2018 is equitable."

¶ 75    First, Lindsay argues that the trial court's findings are contrary to the express purposes of the Act to "make reasonable provision for support during and after an underlying dissolution of marriage" (*id*. § 102(8)), and to "mitigate the potential harm to spouses and their children caused by the process of an action brought under this Act" (*id*. § 102(4)). Lindsay argues that the trial court's ruling is contrary to the plain language of section 504(b-1)(1)(A) of the Act, which refers to "income," and does not provide that the court look to net income at the time of separation, even if many years ago, or disregard years of increased income if the spouse did not contribute towards it.

¶ 76    Generally, courts are empowered to determine entitlement to and details concerning a maintenance award for "either spouse in amounts and for periods of time as the court deems just." *Id*. § 504(a). When a party challenges the trial court's factual findings regarding maintenance, a reviewing court will affirm unless the court's findings were clearly against the manifest weight of the evidence. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 30. The court's ultimate decision to award or deny maintenance will not be reversed absent an abuse of discretion. *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1041 (2008). Generally, the trial court's maintenance award is presumed correct. *Brill*, 2017 IL App (2d) 160604, ¶ 26. The propriety, amount, and duration of maintenance are matters within the discretion of the trial court, and a reviewing court will not reverse the trial court's decision on any of these matters absent an abuse of discretion. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 102. A trial court abuses its discretion where its findings are arbitrary or fanciful, or where no reasonable person would agree with the trial court's position. *Brill*, 2017 IL App (2d) 160604, ¶ 26.

¶ 77    In determining whether an award of maintenance is appropriate, the trial court must consider all relevant factors set forth in section 504(a) of the Act. 750 ILCS 5/504(a) (West 2018); *Hamilton*, 2019 IL App (5th) 170295, ¶ 103. Section 504(a) lists the following factors for the trial court's consideration: (1) the income and property of each party, including marital property apportioned and nonmarital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage, (2) the needs of each party, (3) the realistic present and future earning capacity of each party, (4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage, (5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought, (6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or any parental responsibility arrangements and its effect on the party seeking employment, (7) the standard of living established during the marriage, (8) the duration of the marriage, (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties, (10) all sources of public and private income including, without limitation, disability and retirement income, (11) the tax consequences of the property division upon the respective economic circumstances of the parties, (12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse, (13) any valid agreement of the parties, and (14) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/504(a)(1)-(14) (West 2018).

While the trial court must consider all relevant factors, the trial court need not give each factor equal weight. *Hamilton*, 2019 IL App (5th) 170295, ¶ 103.

¶ 78    Once the trial court concluded that maintenance for Lindsay was appropriate, the trial court had to determine the amount and duration of maintenance. See *id.* ¶ 108. In doing so, the trial court was obligated to consider the statutory guidelines as they related to both the amount and duration of the maintenance; however, "the [trial] court [was] not required to order maintenance in accordance with the statutory guidelines." *Id.*

¶ 79    The statutory guidelines provide litigants and the courts with a simple formula for calculating maintenance. Generally, if the parties' combined gross annual income is less than $500,000, maintenance is calculated by "taking 33 1/3% of the payor's net annual income minus 25% of the payee's net annual income." 750 ILCS 5/504(b-1)(1)(A) (West 2018). Here, however, the trial court did not have reliable and credible evidence to use this formula because the court found that Lindsay's testimony regarding her income was not credible. Specifically, Lindsay asserted that she does not receive tips from the salon's customers, she was not compensated for her work as the salon's manager, her annual gross income for 2024 was about $38,000 to $40,000, and her statements on credit card applications that her income was $70,000 and $75,000 were merely exaggerations. Accordingly, the court imputed an annual income of $50,000 to Lindsay based on full-time employment in her field.

¶ 80    The trial court determined that it would award non-guideline maintenance based on the court's findings that the parties had been living separately since February 2018; Lindsay did not contribute to Ryan's current (2024) $220,000 annual income; and the parties' lifestyle in 2018, when Ryan earned $90,000 annually and Lindsay earned $32,000 annually, was an equitable basis

to calculate Lindsay's maintenance award. The trial court's findings show that, consistent with section 504(b-1)(2) of the Act, the trial court made the non-guideline maintenance award after considering "all relevant factors set forth in [section 504(a) of the Act]." *Id*. § 504(b-1)(2). Specifically, the court considered "the standard of living established during the marriage" (*id*. § 504(a)(7)); "the duration of the marriage" (*id*. § 504(a)(8)); "contributions *** by the party seeking maintenance to the *** career or career potential of the other spouse" (*id*. § 504(a)(12)); and "any other factor that the court expressly finds to be just and equitable" (*id*. § 504(a)(14)).

¶ 81    Once the trial court made its decision to deviate from the guidelines, the court, consistent with section 504(b-2)(2) of the Act, "state[ed] in its findings the amount of maintenance (if determinable) *** that would have been required under the guidelines and the reasoning for any variance from the guidelines." *Id*. § 504(b-2)(2). Under the guidelines, maintenance is determined by applying the parties' net annual income to the statutory formula. *Id*. § 504(b-1)(1)(A). Here, the court properly applied the parties' 2024 annual incomes when it determined that a guideline maintenance award for Lindsay would have been $3,257.58 monthly for 15 months. Then, the court awarded Lindsay non-guideline maintenance of $604.58 monthly for 15 months based on the 2018 annual incomes of Ryan and Lindsay ($90,000 and $32,000, respectively).

¶ 82    Lindsay argues that the trial court failed to comply with section 504(b-2)(1) of the Act because the court, in awarding maintenance, did not "include references to each relevant factor set forth in" section 504(a) of the Act. *Id*. § 504(b-2)(1). We agree. This error, however, is harmless because the court determined that Lindsay was entitled to maintenance and Ryan does not challenge that determination on appeal. Furthermore, the evidence supports the court's decision to award Lindsay maintenance where Ryan earned significantly more money than Lindsay, Ryan

owned nonmarital property whereas Lindsay did not, the testimony indicated that the parties primarily relied on Ryan's income to pay expenses while they were living together, and Lindsay had accumulated significant debt and showed a need for maintenance. See *id*. §§ 504(a)(1), (a)(2), (a)(7); see also *In re Marriage of Los*, 136 Ill. App. 3d 26, 30 (1985) (reviewing courts have consistently held that, where the record is adequate to provide a basis upon which to review the propriety of the decision and the decision is supported by the evidence, the reviewing court will not reverse solely because specific findings are lacking).

¶ 83    Finally, Lindsay argues that the trial court improperly imputed $50,000 in annual income to her because there was no evidence or corresponding finding that she had become voluntarily unemployed, was attempting to evade a support obligation, or had unreasonably refused to take advantage of an employment opportunity. Lindsay, however, misapplies the law. "For the purpose of imputing income, a court must find one of the following: (1) the *payor* has become voluntarily unemployed, (2) the *payor* is attempting to evade a support obligation, or (3) the *payor* has unreasonably failed to take advantage of an employment opportunity." (Emphases added.) *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 30. Here, Lindsay was the payee, not the payor, of the maintenance award. Furthermore, the court calculated the non-guideline maintenance award based on Lindsay's 2018 income of $32,000, not the $50,000 in current annual income the court imputed to Lindsay for purposes of calculating what guideline maintenance would have been if the court had awarded it.

¶ 84    For the foregoing reasons, the trial court's order awarding Lindsay the non-guideline amount of maintenance was not problematic based on Lindsay's challenges in this appeal.

Nevertheless, as discussed above, we remand the issue of maintenance to the trial court for reconsideration as part of the court's reconsideration of the distribution of assets and debts issue.

¶ 85                                    III. CONCLUSION

¶ 86    For the foregoing reasons, we affirm the trial court's judgment allocating parental responsibilities and parenting time. However, based on the trial court's aforementioned errors concerning property distribution, we remand for reconsideration of that issue and the interrelated issue of maintenance.

¶ 87    Affirmed in part and reversed in part.

¶ 88    Cause remanded.